IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

ISAAC H. BROOKS, JR.,

       Petitioner,

v.                                      No. 14-cv-01250-JDB

UNITED STATES OF AMERICA,

       Respondent.

_____

ORDER DENYING § 2255 MOTION,
DENYING CERTIFICATE OF APPEALABILITY,
CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH,
AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL
_____

Before the Court is the *pro se* 28 U.S.C. § 2255 motion of the Petitioner, Isaac H. Brooks,[1] to vacate, set aside or correct his sentence (Pet., ECF No. 1), as supplemented by his later-filed amendment (Am., ECF No. 31) (collectively, the "Petition"). For the reasons set forth below, the Petition is DENIED.[2]

## BACKGROUND

### Indictment and Offense Conduct

On April 19, 2010, a federal grand jury returned a one-count indictment against Petitioner, charging him with twenty-nine counts of personal and business tax evasion in violation of 26 U.S.C. § 7201. On April 30, 2010, Assistant Federal Defender William Joshua

---

[1]Where is it appropriate, the Petitioner is sometimes referred to herein as the "Defendant."

[2]On February 8, 2017, Brooks was released from prison to the federal reentry program. Because the Petition "potentially implicates the length" of his three-year term of supervised release, his claims are not moot. *See United States v. Franco*, 318 F. App'x 411, 416 n.6 (6th Cir. 2009) (internal quotation marks omitted).

Morrow was assigned to represent the Defendant. In February of 2011, Morrow's representation was terminated and Assistant Federal Defender M. Dianne Smothers was substituted as counsel. Several months later, Morrow rejoined the case and represented Brooks as co-counsel with Smothers. On January 6, 2012, Assistant Federal Defender Doris Randle-Holt was substituted for Smothers. (Criminal Case ECF (hereinafter "Cr-ECF") Nos. 2, 8-9, 42, 52, 72.)

According to the revised presentence report ("PSR"), from 1993 through 2007, Brooks owned and operated a temporary employee service called Temp Owned Temporary Services ("TOTS"). Operating as a sole proprietorship, TOTS hired and supplied temporary employees to several local companies, including Whirlpool/Maytag Incorporated ("Maytag"). (PSR at 5-6; Ch. Plea Tr., Cr-ECF No. 101 at 23-25.)

TOTS's customers paid the company a flat rate per employee. From 2002 through 2007, Maytag paid TOTS more than $13 million dollars for temporary employees supplied by Defendant's company. TOTS withheld federal taxes, Social Security taxes, and Medicare taxes from its employees' wages. The business was responsible for forwarding these funds to the federal government. (PSR at 5-16; Ch. Plea Tr., Cr-ECF No. 101 at 24-25; Sent. Hrg. Tr., Cr-ECF No. 129 at 19-24, 27-28; Sent. Hrg., Tr., Cr-ECF No. 130 at 71, 80-111, 119.)

As an employer, TOTS was required to file a quarterly return with the IRS reporting the total wages paid to its employees that were subject to withholdings. For the period 2000 through 2007, Brooks reported $740,352.23 in gross employee wages. Based upon records seized from Defendant's business, however, TOTS paid gross wages of $15,082,066.99. (PSR at 5-6; Sent. Hrg. Tr., Cr-ECF No. 129 at 21-24, 33-35.)

By underreporting gross wages, Brooks avoided paying to the federal government various employment taxes on the unreported wages. The employment-related business taxes

that the Defendant evaded had four components: federal income taxes, including Medicaid taxes, that the Defendant withheld from this employees' wages (FITW), but failed to pay over to the U.S. Treasury; the employees' share of the Social Security tax (employees' FICA), also withheld by Defendant but not forwarded to the federal government; his unpaid employer's share of the Social Security tax (employers' FICA); and unpaid federal unemployment taxes (FUTA) which are to be paid from the employer's pocket. (Social Security and Medicare taxes are hereinafter referred to as "trust fund" taxes.) The total tax loss for the unpaid business taxes was $3,216,029.00. (PSR at 13-16; Sent. Hrg. Tr., Cr-ECF no. 129 at 35-36.)

The Defendant also filed fraudulent individual income tax returns for tax years 2002 and 2003, and failed to file individual income tax returns for tax years 2004 through 2007. The total loss to the federal government of individual income tax was $444,877.00. (PSR at 9.) The combined tax loss occasioned by Brooks's evasion of individual and business taxes was $3,660,905.00. (*Id.* at 16.)

**Plea Proceedings and Sentencing**

Pursuant to an agreement with the Government, Brooks pleaded guilty in May of 2012 to Counts 5 and 20 of the indictment for evasion of personal income taxes and employee-related taxes, respectively. (Plea Agr., Cr-ECF No. 85; Ch. Plea Tr., Cr-ECF No. 101.) Under the plea deal, the Defendant also agreed to file accurate individual and employer income tax returns for the years 2002 through 2007. (Plea Agr., Cr-ECF No. 85 at 2.) The Government agreed to dismiss the remaining charges and, conditioned on the Defendant's "continued acceptance of responsibility," move at sentencing for a one-level downward adjustment for Brooks's acceptance of responsibility and not oppose a two-level downward adjustment. (*Id.* at 2.)

Eight months later, and one week before the scheduled sentencing hearing, Brooks moved to withdraw his guilty plea on the grounds that (1) "he did not willfully or intentionally act to evade or defeat any personal or business taxes that were due and owing" and (2) that "in deciding to enter a guilty plea, . . . he relied upon his counsel's representations that their office would retain a forensic accountant to review the records in th[e] case and determine whether the government's computations regarding the amount of tax loss . . . are correct," but no forensic accountant was hired. (Mot. to Withdraw Guilty Plea, Cr-ECF No. 100 at 2.)

On the first day of the sentencing hearing, January 30, 2013, the Court denied the Defendant's motion to withdraw his plea after hearing Brooks's testimony and the parties' arguments. (Order, Cr-ECF No. 106; Sent. Hrg. Tr., Cr-ECF No. 123 at 59.) The sentencing hearing reconvened on February 11, 2013, and continued through February 12, 2013. The Government requested an upward departure in the offense level on the ground that the TOTS employees were impacted by Brooks's failure to pay their trust fund taxes. The prosecution requested that the Court not award the Defendant a downward departure for acceptance of responsibility "based on [his] submission" after his guilty plea, "of false tax returns to [the] [C]ourt." (Sent. Hr. Tr., Cr-ECF No. 123 at 12.)

In support of its arguments, the Government called IRS Agent Joseph Tyson to the stand. Tyson, the lead criminal investigator in Brooks's case, testified that tax returns for 2005 through 2007, which Brooks prepared and submitted to the Court pursuant to the plea agreement's terms (hereinafter, "revised tax returns"), were false in two respects. First, although the returns showed no income from Brooks's business for the three years covered by the revised returns, financial records showed that Brooks spent millions of dollars in those years on cars, housing, and gambling. Second, according to Tyson, Brooks's deductions which he labeled "contract labor"

and totaling over $1.2 million for the three years, were not, in fact, payments for labor, but rather payments made by the Defendant to Maytag employee Janice Hollingsworth. He testified that the deductions, described as payments for bribes or kickbacks, are not legal deductions. (Sent. Hrg. Tr., Cr-ECF No. 129 at 51-69.)

Morrow cross-examined Tyson regarding the gambling losses reported on the revised returns; Tyson's sampling method for determining TOTS's income; and the lack of a substantial impact on employees due to the nonpayment of their trust fund taxes to the federal government. (*Id.* at 7-83.)

Randle-Holt conducted the direct examination of Brooks. The Defendant testified that he did not intend to file false revised returns, but "was trying to comply with the agreement I had made when I pled guilty," but filled out the forms without the help of an accountant. (*Id.* at 97.) With regard to the "contract labor" deductions, Brooks related that they represent extortion payments to Hollingsworth. According to Brooks, she demanded money from him under threat of pulling Maytag's business. (Sent. Hrg. Tr., Cr-ECF No. 130 at 26-36.) In support, counsel introduced a $15,000.00 cashier's check made payable to Hollingsworth, a $5,000.00 check made payable to "Cash," which contained "Janice Page Hollingsworth" in the memo line, and a check made payable to "Natasha Brooks," which also contained "Janice Page Hollingsworth" in the memo line. (ECF No. 130 at 26-27.) Brooks claimed that the checks were for extortion payments to Hollingsworth. (*Id.*) Counsel introduced photographs of Hollingsworth and Brooks "coming in and out of [a] restaurant." (*Id.* at 32-34.) The Defendant stated that the photos showed him and Hollingsworth at a meeting at which he gave her $14,000.00 in extortion money. (*Id.*)

The Defendant also testified that his contract with Maytag obligated that company, not TOTS, to pay the employee-related taxes. (*Id.* at 37-41.) He stated that the contract introduced into evidence by Randle-Holt, which showed Maytag's obligation, was the authentic contract and contained his authentic signature. (*Id.*)

Randle-Holt also called handwriting expert David Cupp as a witness. Cupp testified that the signature found on the contract produced by Maytag in the civil lawsuit and introduced by the Government was not the same as the signatures found in four samples supplied to him by Brooks and represented by Defendant as being his signatures. (*Id.* at 59-66.) Cupp could not say, however, whether the samples provided to him were, in fact, of Brooks's signature. (*Id.* at 67-68.)

On cross-examination, Petitioner admitted that, during the years covered by the revised returns in which he reported no income, he bought a new Escalade, Mercedes Benz, and furniture; built a house costing over $400,000.00 and furnished it; withdrew monies from TOTS for personal use but did not report those amounts as income on the revised tax returns; and collected taxes from his employees but did not forward that money to the federal government. (Sent. Hrg. Tr., Cr-ECF No. 129 at 102-33; Sent. Hrg. Tr., Cr-ECF No. 130 at 6-25.) He also admitted that the deductions he labeled as "contract labor" on the revised returns were not for that purpose. (Sent. Hrg., Tr., Cr-ECF No. 130 at 42.)

The Court denied a one-point downward adjustment for acceptance of responsibility upon finding that the Government's decision to withhold its recommendation was not based on an unconstitutional motive. (*Id.* at 113-14.) The additional two-point downward adjustment, which ordinarily accompanies a guilty plea, was denied based on the Court's factual findings that (1)

the Defendant falsely claimed in his revised 2005-07 tax returns that he had no income for those years and (2) falsely claimed deductions for extortion payments. The Court stated:

> The other, of course, two level reduction under, I believe it's 3E1.1, and that situation -- that is what is normally attributable to one who enters a plea, but that can be not provided in instances where, for example, one has committed other criminal offenses or has committed other acts that would be contrary to the assessment or the allowance of a two level reduction for acceptance where someone clearly demonstrates acceptance of responsibility for the offense.

> The government's primary argument in regard to the lack of acceptance of responsibility has to do with the submission, according to the government, of the tax returns for the years 2005, 2006 and 2007, which the government indicates were false.

> I think the two primary, at least my recollection of the testimony here, focus, I suppose, of the -- by the government's interrogation of the various witnesses deals with the fact that in the wage column or box, so to speak, of the 1040 form that was -- in all three years there was a lack of any indication of any wages earned or -- earned, I guess, is the right word, by Mr. Brooks during that period of time.

> And Mr. Laurenzi, in questioning Mr. Brooks, Mr. Brooks did, in fact, concede that he had drawn funds, some years different than others, but taken monies out of the company, out of TOTS during those years, but did not include them as part of the wages on the 1040 form.

> In the C form that deals with the business, there are -- in each one of those years there was a inclusion of contract payments, contract employees' payments. And Mr. Brooks explained that at least, I think, two of three, possibly all three, that some of those monies dealt with -- they really weren't contract employment or employee, they were funds used -- well, maybe to some extent, funds used to pay for carpet cleaning or maybe yard work or something of that nature. But the vast majority of the funds were monies that he claimed were paid to [an] employee of Whirlpool.

> And, frankly, no other way to describe it, it would have been a payment for, to allow him to continue his business with Whirlpool. Could be constituted as a bribe or -- and that these funds generally were paid through either cash payments or checks that were made out to cash, but were noted as being payments to Ms. Hollyfield (*sic.*)

> The testimony here, the presentation of evidence only suggests that of the several hundred thousand dollars that were purportedly paid over the three years, the evidence before the court is at most probably less than -- checks that

have been presented, certainly less than 50. Possibly somewhat may have been a little bit more than that, but not much more.

The court finds -- and, of course, there is testimony here that any type of payments such as that, even if the circumstances were correct, it's something that's not deductible as a payment, an expense that would be deductible.

And so, frankly, that designation seems to me by Mr. Brooks was inappropriate, and certainly not -- it was basically submitting inappropriate and false tax returns. And so the court finds that Mr. Brooks is not entitled to the additional acceptance of responsibility points, and the court so holds.

(*Id.* at 114-17.)

Rejecting the Government's argument that TOTS employees were substantially affected by Brooks's failure to pay their trust fund taxes, the Court denied the prosecution's request for an upward departure. (*Id.* at 120-21.) The Court found that the base offense level for the convictions was 24, based on the total tax loss set forth in the PSR. *See United States v. Maken*, 510 F.3d 654, 657 (6th Cir. 2007) ("[A] defendant's base offense level" for "tax evasion and willful failure to file a tax return . . . is determined by the tax loss"). Brooks was sentenced to a within-guidelines prison sentence of fifty-five months and three years of supervised release. He was ordered to pay restitution in the amount of $3,660,905.00, an amount equal to the calculated tax loss. (Order, Cr-ECF No. 108; Sent. Hrg. Tr., Cr-ECF No. 130 at 123-25.)

Petitioner appealed his conviction and sentence, alleging that the district court erred in denying his motion to withdraw his guilty plea and abused its discretion by denying his motion for recusal after his stepdaughter threatened the Court. The Sixth Circuit Court of Appeals affirmed the district court's judgment. *See United States of America v. Brooks,* No. 13-5254 (6th Cir. Apr. 3, 2014).

**BROOKS'S PETITION**

Brooks asserts the following claims:

1. Defense counsel were ineffective by failing to research statutes relating to the legality of deductions claimed on Petitioner's revised tax returns, interview, and call witnesses to prove that the deductions were for extortion, and cross-examine an IRS agent who falsely testified at the sentencing hearing that the deductions were illegal. (Pet., ECF No. 1 at 4.)

2. Defense counsel were ineffective by failing to "investigate, research I.R.S. codes and laws as to 3rd party responsibility" under 26 U.S.C. § 3505(b). (*Id.* at 5.)

3. Defense counsel were ineffective by failing to provide a forensic accountant to assist Petitioner in the completion of the revised tax returns, as promised in exchange for his guilty plea. (*Id.* at 7.)

4. The Government engaged in prosecutorial misconduct by calling to the stand at the sentencing hearing an IRS agent, who lied about the legality of Petitioner's deductions. (*Id.* at 8.)

5. The Government violated *Brady v. Maryland*[, 373 U.S. 83 (1963),] by failing to disclose the results of a handwriting analysis. (Am., ECF No. 31 at 2-3.)

6. Defense counsel were ineffective by failing to request the results of a handwriting analysis from the Government. (*Id.* at 4-5.)

**ANALYSIS**

Brooks is not entitled to relief on any of his § 2255 claims. His ineffective assistance claims are without merit because he either cannot show that his attorneys' performances were deficient or that he was prejudiced, or both. Petitioner's remaining claims are without merit because he has not established the underlying factual allegations to support them.

**Legal Standard**

Section 2255(a) provides that

[a] prisoner in custody under sentence of a court . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the

Constitution or laws of the United States, . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). The statute does not "encompass all claimed errors in conviction and sentencing." *United States v. Addonizio,* 442 U.S. 178, 185 (1979); *Meirovitz v. United States*, 688 F.3d 369, 370 (8th Cir. 2012). Rather, a petitioner must allege "'(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Shaw v. United States*, 604 F. App'x 473, 476 (6th Cir.) (quoting *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001)), *cert. denied,* 135 S. Ct. 2914 (2015). When the judge who presided over the petitioner's underlying criminal case "also hears the collateral proceedings," he "may rely on his recollections of the trial in ruling on the collateral attack." *Blanton v. United States,* 94 F.3d 227, 235 (6th Cir. 1996).

## Evidentiary Hearing

Brooks did not move for an evidentiary hearing on his claims. Nevertheless, the Court considers whether a hearing is warranted. A § 2255 petitioner is entitled to an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). "Stated another way, 'no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).

The records in this case and the underlying criminal case conclusively show that Brooks is not entitled to relief on his claims. An evidentiary hearing is therefore unnecessary.[3]

## Ineffective Assistance of Counsel (Claims 1-3)

A. Legal Standard under *Strickland*

Ineffective assistance of counsel is an "error of constitutional magnitude" cognizable in a § 2255 proceeding. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006). To prevail on a claim of attorney ineffective assistance, a petitioner must demonstrate that (1) his attorney's performance was deficient, that is, it "fell below an objective standard of reasonableness," and (2) his attorney's error prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984). The attorney's performance is presumptively reasonable and the petitioner bears the burden of overcoming the presumption. *Id.* at 689. To show prejudice under *Strickland*, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

B. Ineffective Assistance Relating to Brooks's Deductions for Alleged Extortion by Hollingsworth (Claim 1)

Brooks alleges that his trial attorneys performed deficiently by failing to interview and call witnesses at the sentencing hearing to corroborate his claim that Hollingsworth extorted money from him; failing to research the legality of deductions for business-related extortion

---

[3]The Court disregards factual assertions in Brooks's briefs (ECF Nos. 1-1, 21, 37) and his "Response to Affidavit of Doris Randle-Holt" (ECF No. 14) that are neither established by the record in the underlying criminal case or set forth in another document that was signed as true and correct "under penalty of perjury." *See, e.g.*, *Moore v. Warden, Pickaway Corr. Inst.*, No. 2:11-cv-132, 2012 WL 529580, at *2 (S.D. Ohio Feb. 17, 2012) ("Because Plaintiff's 'Certification' was not made under 'penalty of perjury,' the Court cannot rely on the factual assertions contained in Plaintiff's objections," citing *Evans v. Vinson*, 427 F. App'x 437, 442-43 (6th Cir. 2011)).

payments; and failing to challenge Tyson's false testimony at the sentencing hearing regarding the legality of the purported extortion deductions on the revised tax returns. (Pet., ECF No. 1 at 4; Brooks Br., ECF No. 1-1 at 1-6.) Petitioner argues that, had his attorneys researched the law and interviewed corroborating witnesses, they would have been "prepared" to provide proof at the sentencing hearing that he was extorted, and also would have been able to challenge Tyson's false testimony that the deductions in the revised returns were illegal bribery or kickback deductions. (Brooks Br., ECF No. 1-1 at 2-3.) Petitioner claims that his attorneys' failures prejudiced him because they caused the Court to deny a downward departure for acceptance of responsibility upon finding that he falsely claimed deductions for extortion on his revised tax returns. (*Id.*; Reply, ECF No. 21 at 5, 9.)[4]

---

[4]It is not entirely clear from Brooks's filings whether he is also arguing that his attorneys' conduct relating to the "extortion" deductions led to a higher offense level. He does make that argument with respect to the effect of Tyson's alleged perjury. (*See* Brooks Br., ECF No. 1-1 at 4). Petitioner seems, however, to clarify in his reply that the prejudice flowing from counsel's alleged errors relating to the extortion deductions is limited to the denial of points for acceptance of responsibility. (*See* Reply, ECF No. 21 at 5, 9.)

Nevertheless, even if the Court were to consider the argument that counsels' conduct led to a higher offense level, Petitioner would not prevail. Brooks contends that the "extortion" deductions, if allowed, would have reduced the $3.6 million tax loss to "well below $2,000,000.00." (Brooks Br., ECF No. 1-1 at 4.) He has not, however, submitted any evidence to support that allegation. To prevail, Brooks would have to show that the $1.2 million in "extortion" deductions reported in his revised returns (*see* Sent. Hrg. Tr., Cr-ECF No. 130 at 10-11, 16, 20), would reduce the $3.6 million tax loss by $1.1 million—an amount that would place him in the next lowest offense level. *See* U.S.S.G. §§ 2T1.1(a)(1), 2T4.1(i) (eff. 2003) (tax loss of not more than $2,500,000.00). Notably, deductions do not provide a "dollar-for-dollar reduction" in tax liability. *Telecom*USA, Inc. v. United States*, 192 F.3d 1068, 1079 (D.C. Cir. 1999). If Brooks means to suggest that the extortion payments exceeded the $1.2 million claimed on the revised tax returns, he has not substantiated that claim.

It is also not clear whether Petitioner is arguing that counsels' alleged failure to challenge Tyson's "false" testimony about the legality of the deductions led to a higher restitution amount. Even if made, however, the argument would be without merit. As will be discussed, Brooks has failed to show that Tyson's testimony was untrue.

In arguing that his deductions are legal because they represent extortion payments, Petitioner relies on Section 165 of the federal tax code. (Brooks Aff., ECF No. 20 at 5) (citing 26 U.S.C. § 165.) Section 165 "allows taxpayers to deduct losses not 'compensated for by insurance or otherwise.'" *United States v. Elsass*, 978 F. Supp. 2d 901, 913 (S.D. Ohio 2013), *aff'd*, 769 F.3d 390 (6th Cir. 2014) (quoting 26 U.S.C. § 165(a)). "Included within the permissible § 165 loss deductions for individuals are losses arising from theft." *Id.* To show that the claimed loss was the result of theft, the taxpayer "must prove that the loss resulted from a taking of property that was illegal under the law of the jurisdiction in which it occurred and was done with criminal intent." *Id.* In Tennessee, criminal extortion is defined, in relevant part, as "coercion upon another person with the intent to . . . [o]btain property, services, any advantage or immunity . . ." Tenn. Code Ann. § 39-14-112(a) (West). Under the federal tax code, illegal bribes and kickbacks are not deductible business expenses. *See* 26 U.S.C. § 162(c).

In response to Petitioner's claim that his attorneys did not do enough to prove that his alleged disbursements to Hollingsworth were extortion payments and not bribes or kickbacks, the Government submits the affidavits of Morrow, Randle-Holt, and Smothers. The attorneys attest that they reviewed the evidence that Brooks had been extorted and "discussed [with him] the legal issue of whether [he] would be entitled to a tax deduction for the[] alleged payments . . . " (Morrow Aff., ECF No. 17 at 3; *see also* Randle-Holt Aff., ECF No. at 11 at 2-3; Smothers Aff., ECF No. 18 at 2.) Morrow and Randle-Holt "could not find any legal authority to support Petitioner's claim that his alleged payments to Ms. Hollingsworth qualified as a tax deduction." (Morrow Aff., ECF No. 17 at 9.) Counsel advised the Defendant that his extortion story was weak:

> On many occasions, we discussed [Brooks's] allegation that he paid certain "kickbacks" to Janice Page Hollingsworth, and his theory that he should receive a

> credit or deduction on his tax returns for paying these purported kickbacks. We
> discussed the lack of proof he had to support this claim, including the fact that he
> never went to Maytag management or to the police to inform them about the
> payments to Ms. Hollingsworth, nor did he ever issue her a 1099 or have any
> credible proof of the payments.

(Morrow Aff., ECF No. 17 at 3; *see also* Randle-Holt Aff., ECF No. 11 at 3; Smothers Aff., ECF No. 18 at 3.)

Counsel also aver that they asked Brooks to provide the names, addresses, and telephone numbers of witnesses who could corroborate his extortion story, but that he either did not provide any names, or provided only the names of family members. (Randle-Holt Aff., ECF No. 11 at 3; Smothers Aff., ECF No. 18 at 3.) Morrow further states that he consulted with an accountant and concluded that it was "highly unlikely" the loss amount could be legally reduced. (Morrow Aff., ECF No. 17 at 5-6.)

Despite warnings concerning the weaknesses in his extortion story (and in his theory that Maytag was responsible for the employee-related taxes), the Defendant insisted on filing a motion to withdraw the guilty plea. (*Id.* at 8.) Counsel advised him that, by seeking to withdraw his plea, "he would likely lose his credit for acceptance of responsibility . . . ." (*Id.*)

At sentencing, the Defendant insisted on "maintaining [his] claims" that he was extorted and that Maytag was responsible for the employee-related taxes. (*Id.* at 9.) In accordance with his wishes, defense counsel presented evidence at the sentencing hearing regarding both theories. (*Id.* at 8; Randle-Holt Aff., ECF No. 11 at 5.) The record shows that, with respect to the purported extortion, counsel introduced Brooks's testimony, photographs of the Defendant and Hollingsworth at a restaurant, a cashier's check made payable to Hollingsworth, and two checks with Hollingsworth's name in the memo line.

In response to counsels' averments, Brooks submits his own affidavit, in which he disputes counsels' statements that he did not identify others who could corroborate his extortion story:

> Petitioner states he give [m]any witnesses to counsel, in fact Attorney S. Brooks, Attorney N. Pride, Jeanies Bond (Banker), Derrick Britt (Friend, Bondman), Earl Shaw (Friend, Funeral Director), Charlis Ellison (Accountant), Natasha Brooks (office [m]gr/daughter), and David Cupp (Handwriting expert)[.] Petitioner complained often to these individuals, but further states [he] gave defense counsel the information and knowledge of each witness, such as, attorney Brooks was at Petitioner['] s home when note was left to Petitioner (asking for money $80,000) from Mrs. Hollingsworth, attorney Pride was hired to investigate and find way to get her out of Petitioner['s] pocket and stop the madness, Mr. Britt and Earl Shaw was with me on one occasion when I went to Bank [and] withdrew $15,000 and watched me deliver it to Mrs. Hollingsworth behind a dog [k]ennel, this list is a making for a novel, but my counsel was given these individuals many times.

(Brooks Aff., ECF No. 20 at 3-4.)

As announced in *Strickland*, defense counsel has a duty to adequately investigate his client's case. *Strickland*, 466 U.S. at 690-91. That duty encompasses researching the legal and factual bases for a defense. *Id.* "The focus in failure-to-investigate claims . . . is the reasonableness of [counsel's] investigation (or lack thereof)." *English v. Romanowski,* 602 F.3d 714, 726 (6th Cir. 2010). ". . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690.

Brooks has not established that his attorneys performed deficiently with respect to their research into the legality of his alleged extortion deductions. As noted, they attest that they found no legal support for the deductions, including after consulting with an accountant about possible ways to legally reduce the tax loss. Petitioner provides no evidence to counter those averments and does not suggest what more his counsel should have done. Counsels' conduct was not objectively unreasonable.

Petitioner also has not shown that his attorneys rendered ineffective assistance by not challenging Tyson's "perjured" testimony about the legality of the deductions. As will be discussed, Brooks has not shown that Tyson's testimony was false and, thus, his counsel did not have a duty to challenge the testimony on that basis.

As to Brooks's allegation that his attorneys failed to interview witnesses who could corroborate his extortion story, the affidavits create a factual dispute as to whether Petitioner gave his attorneys the names of potential witnesses. However, even accepting as true Brooks's averment that he did provide names, there is no prejudice.

To establish prejudice based on counsels' alleged "failure to investigate a potential witness," a petitioner must make "a specific, affirmative showing of what the missing witness's testimony would be, and this typically requires an affidavit from the overlooked witness." *United States v. Hassan*, Nos. 12-CR-20523 & 14-CV-11592, 2014 WL 5361942, at *5 (E.D. Mich. Oct. 21, 2014) (quoting *Thompkins v. Pfister,* 698 F.3d 976, 987 (7th Cir. 2012)). Here, Brooks has submitted only his own affidavit to support his allegation that there were witnesses who could corroborate his version of events. Although he provides some specifics about the where and when of the witnesses' potential testimony, the details are not wholly inconsistent with a bribery or kickback scheme, as opposed to extortion. Therefore, without the affidavits of the potential witnesses, it is mere speculation that they would have provided favorable information that would have caused a different result at the sentencing hearing.

Brooks's problem with speculation does not end here. As to *all* of counsels' alleged failures relating to the deductions, Petitioner cannot show prejudice because the harm he claims is imaginary. Had counsel proved that the deductions were legal, the undersigned still would not have granted the Defendant a reduction for acceptance of responsibility. *See, e.g., Armando-*

*Reyes v. United States*, Civil Action No. 1:15-CV-3311-ODE-RGV-2, 2016 WL 1703374, at *3 (N.D. Ga. Apr. 27, 2016) (holding that § 2255 petitioner had not shown prejudice where, even had counsel performed deficiently, "[t]he Court would not have granted [him] an acceptance of responsibility reduction . . . . and [his] belief that he would have received a lesser sentence is pure speculation.").

Under the United States Sentencing Commission *Guidelines Manual*, a court may award a two-level decrease in the offense level for the defendant's acceptance of responsibility and, upon motion of the Government, an additional one-level reduction. U.S.S.G. § 3E1.1. "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," U.S.S.G. § 3E1.1, comment. (n.5.), and thus "has broad discretion on this issue," *Simpson v. United States*, No. 95-2290, 1996 WL 250450, at *2 (6th Cir. May 10, 1996); *see also United States v. Ellens*, 43 F. App'x 746, 750-51 (6th Cir. 2002). As noted, this Court's decision to deny the downward adjustment for acceptance of responsibility was based not only on its factual finding that Brooks had falsely reported deductions for extortion, but also on the fact that he admitted under cross-examination that he had taken money out of the company during those years but did not include them as wages on the revised tax returns. (Sent. Hrg. Tr., Cr-ECF No. 130 at 114-17.) That latter finding is sufficient, by itself, to deny the downward adjustment.

Moreover, the Defendant's attempt to withdraw his guilty plea on the ground that he had done nothing illegal, his insistence even at the sentencing hearing that it was Maytag's responsibility to pay the trust fund monies ("That was not and was never my responsibility.") (*id.* at 107), and his statement to the Court at sentencing that "I did not know that I was willfully doing anything to evade my taxes" (*id.*), would also support a rejection of the downward adjustment. *See United States v. Christopher*, 91 F. App'x 471, 474 (6th Cir. 2004) (a

defendant's continued denial of "the requisite intent" to commit the crimes "is sufficient grounds for denying . . . a reduction for acceptance of responsibility"); *Ellens*, 43 F. App'x at 750-51 (district court did not abuse discretion in denying reduction for acceptance of responsibility where defendant attempted to withdraw his guilty plea).

Because Petitioner has not met *Strickland*'s test, Claim 1 is DENIED.

## C.  Ineffective Assistance as to Third-Party Liability (Claim 2)

Brooks asserts that his attorneys were ineffective by failing to "investigate, research I.R.S. codes and laws as to third party responsibility under I.R.C. 3505(b)." (Pet., ECF No. 1 at 5.)[5]  In particular, he alleges that he informed counsel that Maytag was responsible for the employee taxes pursuant to his contract with that company, but they did little to pursue that theory.  (Reply, Aff., ECF No. 20 at 5.)

In support, Petitioner attests in his affidavit that he told counsel about witnesses who could corroborate his story, including Cupp, and others whom he identifies by name.  He avers that he told his attorneys early on that Cupp could substantiate his claim that the contract in Brooks's possession, which showed that Whirlpool would pay the trust fund taxes, was authentic, while the contract produced by Whirlpool during Brooks's failed civil lawsuits against the company was a forgery.  (*Id.* at 5.)  According to Petitioner, his attorneys did not interview any of the potential witnesses, except Cupp, whose testimony they were unprepared to develop. (*Id.* at 5, 7; ECF No. 1-1 at 7-8.)

Petitioner insists that, had his attorneys done more to prove Maytag was obligated to pay the employee taxes, his restitution amount would have been reduced "to less than

---

[5]"Under 26 U.S.C. § 3505(b), the United States can hold third parties liable for an employer's failure to remit employment taxes withheld from employees' wages" under certain circumstances.  *Mercantile Bank of Kansas City v. United States*, No. 90-0781-CV-W-9, 1997 WL 33558612, at *2 (W.D. Mo. Mar. 21, 1997).

[$]200,000[.00]" and his offense level would also have been lower.  (Brooks Br., ECF No. 1-1 at 8.)

Randle-Holt, Smothers, and Morrow aver that they investigated and discussed with the Defendant his theory that Maytag was obligated to pay the employee taxes, sought additional information and evidence from him to support the theory, and informed him of the weaknesses in his story.  (Smothers Aff., ECF No. 18 at 1-3; Randle-Holt Aff., ECF No. 11 at 3; Morrow Aff., ECF No. 17 at 3-4.)  As Morrow states:

> We discussed [with the Defendant] the two inconsistent contracts between Maytag and Petitioner's company, Temp Owned Temporary Services, or TOTS.  We discussed the prior civil lawsuits that he had filed against Maytag in the Circuit Court for Madison County and in the United States District Court for the Western District of Tennessee, and the allegation raised by the defense in those cases that the contract Petitioner claimed to be correct was, in fact, a forgery.
>
> We further discussed the problem with Petitioner's theory that Maytag was required to pay taxes on his staff members, given that Maytag hired his staffing company to secure qualified staff and it would not have made sense for them to agree to pay the taxes on his staff members.  We also discussed the fact that he had not entered into a similar business arrangement with his other clients, as they were not paying the taxes for his staff members, and thus it would not have made sense for Maytag to have agreed to do this.  We asked for the names, addresses, and phone numbers of witnesses that could support his claim, but he never provided us with any witnesses.

(Morrow Aff., ECF No. 17 at 3-4.)

Despite their advice, Petitioner wished to pursue the theory at sentencing.  (*Id.* at 9.)  Morrow and Randle-Holt therefore presented evidence at the sentencing hearing to support the theory, including Brooks's testimony, the contract which Petitioner claimed was the authentic agreement with Maytag, and Cupp's testimony.

Petitioner has not established that counsel rendered ineffective assistance.  First, he has not submitted any evidence to support his allegation that counsel did not research the laws of

third-party liability for employee taxes. Although he attests he gave Randle-Holt and Morrow a copy of a case, which he says the latter read, that averment does not establish counsel did not know or research the legal concept of third-party responsibility. He has therefore failed to establish his attorneys performed deficiently in that regard.

Furthermore, Petitioner does not demonstrate he was harmed by counsels' alleged failure to investigate witnesses who could corroborate his claim that Maytag was responsible for the employee taxes. Although the affidavits create a factual dispute as to whether Brooks gave his attorneys the names of potential witnesses, he has not demonstrated prejudice. He avers he identified numerous witness for his attorneys, but he has not submitted affidavits from any of those witnesses and, thus, has not made "a specific, affirmative showing of what the missing witness[es'] testimony would be." *Hassan*, 2014 WL 5361942, at *5. In addition, with regard to Cupp, counsel did call him to the stand at sentencing. To the extent Petitioner argues that his attorneys were unprepared to develop Cupp's testimony, he does not specify or show in what ways they were unprepared or how the development of Cupp's testimony was thereby affected. Brooks's assertion that he was prejudiced by his attorneys' failure to investigate witnesses is therefore unsubstantiated.

Finally, the Defendant's sworn testimony at his change of plea hearing is a "formidable barrier" to his claim, which he has not overcome. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Petitioner's position in this collateral proceeding is that his attorneys should have done more to pursue for sentencing the theory that Maytag, not Brooks, was legally responsible for paying the employee-related taxes. However, eight months before the sentencing hearing, Petitioner pleaded guilty to Count 20 of the indictment, which charged an intentional failure to pay employee-related taxes, in violation of 26 U.S.C. § 7201. An element of that offense is the

defendant's "legal duty to pay" the tax. *United States v. House*, 617 F. Supp. 240, 243 (W.D. Mich. 1985). Brooks's guilty plea to a violation of § 7201 therefore includes his admission that he is legally responsible to pay the employee taxes. The Court found the guilty plea was voluntary, and the Sixth Circuit affirmed that determination. Therefore, in light of his sworn admission that he was responsible to pay the employee taxes, Petitioner has not shown a reasonable probability that the outcome at sentencing would have been different had his attorneys done more to pursue the theory that Maytag was responsible.

For these reasons, Claim 2 is DENIED.

D. Ineffective Assistance as to Forensic Accountant (Claim 3)

In Claim 3, Petitioner alleges that his attorneys induced him to enter a guilty plea with the promise that their office would provide a forensic accountant to help him prepare the revised returns, but they failed to deliver on that promise. (Pet., ECF No. 1 at 7.) He attests to the same in his affidavit. (Brooks Aff., ECF No. 20 at 6.) Brooks argues that he was prejudiced by his attorneys' conduct because, had an accountant helped him, the revised tax returns "would have been prepared correctly" and would have resulted in the Court awarding the "three point reduction" for acceptance of responsibility and "reducing the 3.6 million" in restitution. (Brooks Br., ECF No. 1-1 at 9.)

Morrow and Randle-Holt, who represented the Defendant during the plea negotiations and at the change of plea hearing, aver in their affidavits that they told Brooks they were not appointed to assist him in the filing of his tax returns. (Morrow Aff., ECF No. 17 at 3; Randle-Holt Aff., ECF No. 11 at 2.) According to Morrow, although "counsel did not promise Petitioner an accountant to help prepare his 2002-2007 taxes in exchange for his agreement to plead guilty," they did "agree to speak with an accountant" if Brooks decided he wanted to "challenge

the amount of loss (or relevant conduct) in his case." (Morrow Aff., ECF No. 17 at 5.) Morrow further avers that,

> [c]ounsel did speak with an accountant and received an estimate of the costs for performing this service, but counsel ultimately determined that it would not be cost-effective to retain this individual because (1) such an investigation would have taken months and involved very substantial costs; and (2) it was highly unlikely that any analysis performed by the accountant would had given the defense a good-faith basis to challenge the loss amount (or the corresponding base offense level) in this case.

(*Id.* at 6.)

Brooks's claim is without merit for several reasons. First, his averment that his attorneys promised to provide him with a forensic accountant in exchange for his guilty plea is contradicted by the plea agreement and the plea colloquy in his criminal case. The plea agreement, which the Defendant signed, states that he "will enter a *voluntary* plea of guilty to Count 5 [and] Count 20 of the indictment." (Plea Agr., Cr-ECF No. 85 at 1 (emphasis added).) The agreement also contains an integration clause, which provides in pertinent part that

> [n]o additional promises, representations or inducements other than those referenced in this Plea Agreement have been made to the Defendant or to the Defendant's attorneys with regard to this Plea Agreement, and none will be made or entered into unless in writing and signed by all parties.

(*Id.* at 3.) At the change of plea hearing, the prosecutor summarized the plea agreement, including the language about promises, representations, or inducements. (Ch. Plea Tr., Cr-ECF No. 101 at 18.) The Court asked Brooks if he understood the terms of the plea agreement and whether his plea was voluntary. (*Id.* at 15, 19.) Petitioner answered in the affirmative to both questions. (*Id.*)

By signing the plea agreement, the Defendant agreed, through the integration clause, "that no other promises were made or contemplated in its execution." *See Osuna v. United States*, No. 1:10-cv-1135, 2011 WL 5088710, at *3 (W.D. Mich. Oct. 25, 2011). "Such an

integration clause ordinarily prevents [a petitioner] from claiming that other promises were included in the plea agreement." *Id.* (citing *United States v. Hunt*, 205 F.3d 931, 935 (6th Cir. 2001)). Additionally, Brooks's testimony that his plea was voluntary and not made in exchange for promises not contained in the plea agreement, was "made while under oath and in open court," and therefore "'carr[ies] a strong presumption of veracity.'" *Kaufman v. Mich. Parole Bd.*, No. 05-73933, 2007 WL 1562786, at *11 (E.D. Mich. May 29, 2007) (quoting *Blackledge,* 431 U.S. at 74). Petitioner's contrary averment in this § 2255 proceeding, without more, "does not entitle him to habeas relief." *Id.* (citing *Hastings v. Yukins,* 194 F.Supp.2d 659, 669-70 (E.D. Mich. 2002)). *See also Osuna,* 2011 WL 5088710, at *3 (denying § 2255 relief on petitioner's ineffective assistance claim based on assertion "that his attorney induced him into signing the plea agreement by making promises about leniency in his brother's sentencing," where the claim was contradicted by the integration clause of the plea agreement and petitioner's sworn statements during the plea colloquy).

Further, the Court has already found that Petitioner's plea was not induced by any promises not contained in the plea agreement. Eight months after his guilty plea, the Defendant filed a motion to withdraw the plea. One of the grounds advanced in support of the motion was that trial counsel had promised to provide a forensic accountant in exchange for the plea but had not delivered on that promise. At the hearing on the motion, Brooks explained why he had affirmed to the Court at the change of plea hearing that no promises had been made to him that were not contained in the plea agreement:

> And I believe then I was asked another question about a promise. And I think I hesitated and I moved to ask my counsel a question, which was you, Ms. Holt, because I didn't really know how to respond to a question like that after knowing I had been made a promise. So I answered the best way I could.

(Sent. Hrg. Tr., Cr-ECF No. 123 at 27-28.)

After hearing Brooks's testimony, and considering his sworn testimony at the change of plea hearing, the Court found that Brooks's plea had been voluntary. The Court therefore denied the motion to withdraw the plea, and the Sixth Circuit affirmed.

At bottom, the record in the underlying criminal case belies Brooks's allegation that his attorneys promised to provide a forensic accountant to help him prepare the revised tax returns. Petitioner therefore has not shown that counsel performed deficiently by failing to secure those professional services.[6]

Brooks also does not show that he was prejudiced by counsels' failure to provide an accountant. As noted, he argues that, had an accountant helped him, the revised tax returns "would have been prepared correctly" and would have resulted in the Court awarding the "three point reduction" and "reducing the 3.6 million" in restitution. (Brooks Br., ECF No. 1-1 at 22.) With regard to the point reduction, the Court has already held there is no reasonable probability it would have awarded the downward adjustment—in part because the Defendant claimed on the revised returns that he had no income, but admitted on cross-examination that he took money out of TOTS for personal expenditures. Despite Brooks's testimony that the false figures on the revised returns were unintentional mistakes and defense counsel's argument that the income figures were simply the errors of an untrained layman, the Court found the incomes Brooks reported were intentional falsehoods. An accountant certainly might have helped Petitioner avoid unintentional errors, but his intentional misreporting of income cannot be attributed to the absence of professional accounting help.

---

[6]Although not explicitly argued by the parties, the Court finds that counsels' independent decision not to hire an accountant to challenge the amount of the tax loss was not objectively unreasonable. The decision was based on a strategic calculation, made after consulting with an accountant and in light of the evidence, that a forensic accounting investigation would have been very costly but likely would not have yielded a good-faith basis for reducing the tax loss amount.

In addition, Petitioner's allegation that an accountant would have helped reduce the restitution amount is conclusory. Brooks has not demonstrated (or even alleged specifically) how an accountant would have helped him establish that his deductions were, in fact, based on extortion as defined by Tennessee law, or would have provided some other basis for reducing the tax loss.

For these reasons, Claim 3 is DENIED.

## Prosecutorial Misconduct (Claim 4)

Petitioner submits that the prosecution engaged in misconduct by its "use of Agent Tyson [who] lie[d] to the Court." (Pet., ECF No. 1 at 8.) Specifically, Brooks asserts that Tyson falsely testified that the "contract labor" deductions on the revised returns are not deductible as bribes or kickbacks. (Brooks Br., ECF No. 1-1 at 5.) He claims that he was prejudiced by Tyson's testimony because it "cause[d] Judge Breen to not allow Brooks 3 point reduction causing sentencing to be unfair" (Pet., ECF No. 1 at 8), led to a higher offense level, and "increase[d the restitution amount] due and owing." (Brooks Br., ECF No. 1-1 at 5).

The Government argues that the claim of prosecutorial misconduct is without merit because Tyson's testimony was not false. (Resp., ECF No. 19 at 9-10.) The Court agrees.

A prosecutor commits misconduct in violation of the due process clause if he or she knowingly presents false testimony or fails to correct testimony the prosecutor knows to be false. *Napue v. Ill.*, 360 U.S. 264, 269 (1959). The burden of establishing false testimony is on the defendant. *Brooks v. Tenn.,* 626 F.3d 878, 895 (6th Cir. 2010). To prevail under *Napue*, a defendant must show that (1) the witness's testimony was "actually false," (2) the testimony was "material," and (3) "the prosecution knew [the testimony] was false." *Id.*

Tyson testified, in relevant part, as follows:

Q. [AUSA Laurenzi] Let me ask you one last question. Is a bribe deductible on your tax returns?

A. [Tyson] No, it is not.

Q. Should the bribe have been put down as
contract labor?

A. No. Under Code Section 162 of the code, it's not an ordinary/necessary business expense and would not be deductible.

Q. If you take, according to Mr. Brooks, that he paid Ms. Hollingsworth those sums of money just in '05, '06 and '07, would that have changed your calculations?

A. Yes. Under the personal expenditure indirect method it would have changed my computation of tax due and owing.

Q. Can you tell me by how much would it have changed it?

A. Probably several hundred thousands dollars in tax due and owing.

Q. And tell me how you get to this additional $700,000 taxes due and owing?

A. I said several hundred --

Q. Okay.

THE COURT: He said several, I think.

BY MR. LAURENZI:

Q. Several hundred?

A. Yes.

Q. And how would that have been?

A. Well, being that it's, depending on what you call it, a bribe, a kickback, and those being nondeductible business expenses, and therefore it's a personal expenditure. And under the personal expenditures indirect method, that would have increased his personal expenditures for each of those years for -- once again, he would have had to have had a source of funds to have paid those monies. And those sources of funds would have gone in as additional taxable income.

Q. For example, for the year I believe it was 2006 where the contract labor was right at 499,000. Under your calculations that would have come back in; is that correct?

A. Yes, it would have.

Q. And then that amount would have been taxed; is that right?

A. Correct.

Q. And on what percentage was he being taxed at? What percentage would that $490,000 been taxed at?

A. I don't have an exact percentage. Even the lowest percentage rate, say 10 percent, you're talking almost $50,000 of tax.

Q. Just for that one year?

A. Just for the one year, yes.

Q. Which would have been increased?

A. Right.

Q. Based upon his payment of the bribe?

A. Yes.

(Sent. Hrg. Tr., Cr-ECF No. 130 at 84-86.)

Petitioner's contention that Tyson lied is not supported by the record. It was the Government's theory that the "contract labor" deductions that Brooks claimed on his revised returns were kickbacks or bribes which he voluntarily made to Hollingsworth to secure Maytag's business. When asked whether kickbacks or bribes are legal deductions, Tyson truthfully answered that they are not. When asked to describe the tax implications of the Defendant's deductions, Tyson qualified his response, stating "depending on what you call it, a bribe or a kickback," the payments are "nondeductible" and therefore "a personal expenditure."

Brooks's claim that Tyson's testimony is untrue also fails because he has not shown the deductions *in fact* were extortion payments rather than bribes or kickbacks. His position that the prosecution intentionally used or overlooked perjured testimony is therefore without merit. Claim 4 is DENIED.[7]

### *Brady* Violation and Counsels' Related Ineffective Assistance (Claims 5 and 6)

Petitioner alleges that the Government failed to turn over to the defense the results of a handwriting analysis. (Am., ECF No. 31 at 2-4.) Specifically, he claims that Tyson took handwriting samples from him during the IRS's investigation and submitted those samples for analysis. (*Id.* at 2-3.) According to Petitioner, the results of the analysis would have proved Maytag's contract was a forgery, while the contract that places a duty on Maytag to pay the employee trust fund monies would have been shown to be authentic. (*Id.*) Brooks also alleges that his attorneys rendered ineffective assistance by not requesting the handwriting analysis report from the Government. (*Id.* at 4-5.)

In response, the Government submits the supplemental affidavit of Tyson. Tyson states that he did take handwriting exemplars from Brooks and had in his possession the conflicting contracts. (Tyson Supp. Aff., ECF No. 35-1 at 2.) He avers, however, that he did not submit the exemplars for analysis and further, that "[n]o analysis was performed . . ." (*Id.*)

In *Brady*, the Supreme Court held that the due process clause is violated when prosecutors withhold from the defense evidence favorable to the accused where the evidence is material either to guilt or punishment. *Brady*, 373 U.S. at 87. A *Brady* violation has three components: "the evidence at issue must be favorable to the accused, either because it is

---

[7] Petitioner's related charge that the Government's use of Tyson's "perjured" testimony constituted a breach of its promise to recommend a reduction for acceptance of responsibility (Pet., ECF No. 1 at 8) is likewise without merit, as Tyson's testimony has not been shown to be false.

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008) (quoting *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999)).

Here, Brooks's contention that the prosecution performed a handwriting analysis and prepared a written report of the results is speculative and finds no support in the record. Tyson attested in his affidavit that no such analysis was performed and Brooks has not submitted factual material to contradict that statement. Because "[t]he prosecution has no duty to turn over to the defense evidence that does not exist," Petitioner's *Brady* claim is without merit. *See Brogdon v. Blackburn,* 790 F.2d 1164, 1168 (5th Cir. 1986) (per curiam) (government did not violate *Brady* where there was no credible evidence that blood alcohol test had been performed); *see also Hodges v. Parker*, 493 F. App'x 704, 709 (6th Cir. 2012) (government did not violate *Brady* where the evidence "did not exist at the time of . . . trial").

Brooks's related claim that counsel rendered ineffective assistance by failing to request a copy of the handwriting analysis from the prosecution is likewise without merit. Petitioner cannot show he was prejudiced by his attorneys' failure to request something that does not exist. Claims 5 and 6 are therefore DENIED.

## CONCLUSION

Because Brooks's claims are meritless, the Petition is DENIED. The Clerk of Court is DIRECTED to enter judgment for the United States.

## APPEAL ISSUES

A § 2255 petitioner who challenges his state custody may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); FED. R. APP. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial

showing of the denial of a constitutional right. 28 U.S.C. §§ 2253(c)(2)-(3). Although a COA does not require a showing that the appeal will succeed, *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003), a court should not issue a COA as a matter of course, *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

In this case, there is no question that the Petition should be denied for the reasons stated. Because any appeal by Brooks does not deserve attention, the Court DENIES a COA.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. FED. R. APP. P. 24(a). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *Id.*

In this case, for the same reasons it denies a COA, the Court CERTIFIES, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is therefore DENIED.

IT IS SO ORDERED this 22d day of May 2017.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE